## GREAUD v. THE PUEBLO.

### No. 745.

District Court, E. D. Louisiana,
New Orleans Division.

May 31, 1948.

John D., M. A., and Edwin H. Grace, of New Orleans, La., for plaintiff.

Terriberry, Young, Rault & Carroll, of New Orleans, La., for defendant.

Lemle, Moreno & Lemle, of New Orleans, La., for intervening libelant.

DAWKINS, District Judge.

This case involves the question of liability on the part of the tank steamer, Pueblo, owned by Gulf Oil Corporation, for the sinking of a motor propelled fishing schooner in the vicinity of bell buoy No. 6 at the entrance of Calcasieu Pass in the Gulf of Mexico, about 1 o'clock A. M. on July 6, 1943, when we were in the midst of World War II, and when all vessels were moving under blackout, that is, without lights, under orders of the Navy Department.

Libelant's fishing boat, the Arizona, was anchored with several others, according to his contention, north and east of this buoy two miles or more distant therefrom, but admittedly seven or eight miles outside a line on a map issued by the United States Coast and Geodetic Survey, published in December 1939, running approximately parallel to a section of the Louisiana coast, extending from the Mississippi River to Galveston Bay. This line indicated roughly the five fathoms area, and all these fishing vessels had been directed by the Coast Guard to withdraw from the open sea into the area when anchoring at night. Instead, libelant's vessel, as stated, at the time of the collision was not only anchored many miles outside this safety zone, but its crew of three were all asleep and no watch was on duty. Their first knowledge of the approach of the tanker was its impact, which sank their boat within a few minutes. They, too, were not permitted to display lights when anchored. These facts are not disputed and in the judgment of the Court constitute gross negligence. It is contended that by custom and usage these fishing boats had, for a long time, been anchoring at night in the locality, which fact was well known to ocean going vessels plying between ports east and west of that point and that the lane of travel was south of buoy No. 6; that claimant's tanker at the time in question, had deviated several miles to the north of this lane and on discovering its position, when the buoy came into view, it turned southwesterly, thus bringing its course directly across the anchorage of the fishing vessels.

The issue as to the custom and knowledge on the part of ocean going vessels is seriously disputed. The only facts conclusively proven with reasonable certainty

are that buoy No. 6 and other buoys were placed in the vicinity for the guidance and protection of vessels entering and leaving Calcasieu Pass, leading to the port of Lake Charles, which was undoubtedly known to all ships, and placed upon them the duty of great care and caution when passing, entering or departing from said pass. They were not intended to serve as protection for anchored vessels, such as that of libelant.

Therefore, the crew of the Arizona was guilty of gross negligence, which bars recovery, unless fault on the part of Pueblo is shown to have contributed to the loss.

Of course, the Pueblo, as well as all other vessels traveling under the blackout conditions required by the necessities of war, carried a heavy duty to exercise the greatest care. Even under the libelant's contention as to the position of Arizona, Pueblo had located buoy No. 6 more than two miles before reaching it and changed its course to the southwest in order to pass south and outside of that buoy. The tanker, at that stage, still had plenty time to slacken its speed before passing the entrance to the Calcasieu channel. It is true that Pueblo had a single lookout on its bow, but the night was clear, the sea was calm and it was expected to pursue its voyage with little delay. The evidence shows that Arizona was discovered as soon as it was possible. The latter, being very small, as compared to Pueblo, lay low in the water and could be seen at a distance of about 1000 feet only, but even then could not be distinguished from a floating log or derelict. Criticism is levelled at the bridge officer of the tanker for not starting change of course at the first alarm of the lookout, but the explanation given by that officer seems reasonable, that is, until he could ascertain whether the object was a vessel, and direction it was moving, a change in the course of Pueblo was unsafe. A few seconds later, when the lookout ascertained the object was stationary, signal was given for turning to port, which was promptly executed, but too late to avoid a glancing blow, which sank the Arizona.

It is felt that an extended discussion of the evidence is unnecessary but that it is sufficient to say the great weight of it supports the conclusion that the crew of the Arizona were guilty of negligence, which caused its sinking and fails to show negligence on the part of Pueblo contributing to the collision.

Libelant cites and relies on T. 33, Sec. 367, U.S.C.A., which creates a presumption of fault, where one of the colliding vessels fails to stand by and render aid to the other. In this instance, it is conceded that Pueblo with reasonable promptness, after striking Arizona, reversed its course and returned to the spot, sending up flares and circling in the locality. The former's crew admitted seeing signals of distress from the stricken vessel, but claim they were discontinued before the point had been reached. They testified that after more than thirty minutes of diligent search they were unable to discover any person or object and then continued on their journey. With equal vigor witnesses for libelant say that, although Pueblo returned and members of its crew answered calls from those of Arizona, who were in the water, and a mattress was set afire to show their location, etc., for some unaccountable reasons, no lifeboat was launched or other effort made by Pueblo, which wilfully left the scene without giving the aid required under the circumstances.

This suit is for the loss of the Arizona, its equipment and cargo alone. There is no claim for personal injuries or loss of life. The evidence is conclusive that the blow from the Pueblo was fatal and nothing could have been done to save Arizona. If it be conceded that the former failed to do all that was required of it under the circumstances, after the collision, this would not serve to fix upon it liability, in view of a clear showing that the fault was that of Arizona.

The Court, therefore, is constrained to hold that there is no liability on the part of Pueblo.

Proper decree should be presented.